# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA J. MASSEY,<br><br>   Plaintiff,<br><br>  v.<br><br>ANDREW M. SAUL[1],<br>Commissioner of Social Security,<br><br>   Defendant. | Case No.: 1:18-cv-00937 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF PATRICIA J. MASSEY |

Patricia Massey asserts she is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the medical record and seeks judicial review of the decision to deny her application for benefits. Because the ALJ applied the proper legal standards and the decision is supported by substantial evidence in the record, the administrative decision is **AFFIRMED**.

## **BACKGROUND**

In February 2014, Plaintiff filed her application for benefits, in which she alleged disability beginning September 18, 2010, due to bipolar disorder, depression, anxiety, migraines, post-traumatic stress disorder, a learning disability, sleep apnea, COPD, fibromyalgia, neuropathy, and "back pain (deteriorating disks)." (Doc. 9-5 at 31; Doc. 9-8 at 2-8) The Social Security Administration denied the

---

[1] This action was originally brought against Nancy A. Berryhill in her capacity as then-Acting Commissioner. Andrew M. Saul, the newly appointed Commissioner, has been automatically substituted. *See* Fed. R. Civ. P. 25(d).

1

applications at the initial level and upon reconsideration. (Doc. 9-6 at 2-4, 11-16) Plaintiff requested a hearing and testified before an ALJ on January 10, 2017. (Doc. 9-3 at 17; Doc. 9-4 at 84) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on May 3, 2017. (Doc. 9-3 at 17-28) Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on May 23, 2018. (*Id.* at 2-5) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that a claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A. Relevant Medical Evidence[2]**

Dr. Woodrow Wilson performed a consultative examination on June 28, 2012. (Doc. 9-10 at 9) Plaintiff described a history of migraine headaches beginning in 2009 and rheumatoid arthritis that was diagnosed in 2010. (*Id.*) Dr. Wilson observed that Plaintiff walked with a normal gait; could "go up on her toes, back on her heels, [and] balance weight on each foot independently;" and stood from a chair without difficulty. (*Id.* at 10) He noted Plaintiff reported neck pain when she moved her arms, but she had a full range of motion in her elbows, wrists, hands, hips, knees, and ankles. (*Id.*) Dr. Wilson found "no obvious rheumatoid changes to her hands or fingers." (*Id.*) Plaintiff's motor strength was 5/5. (*Id.* at 11) Dr. Wilson noted Plaintiff "complained of decreased sensation in the left toes as compared to the right side" when testing her sensation to touch, and he was unable to elicit tendon reflexes in the patella or Achilles on either leg. (*Id.*) Dr. Wilson concluded Plaintiff "could sit for six to eight hours in an eight-hour day" and "stand[] and walk[] probably four to six hours each." (*Id.*) He indicated Plaintiff still had limits due to a hysterectomy, which was followed by a staph wound infection, and opined

---

[2] Plaintiff's challenge the ALJ's evaluation of medical opinions addressing her physical impairments. Thus, while the Court has the Court has read and considered the entire medical record, this summary omits evidence related to Plaintiff's mental impairments.

"[s]he could lift only 10 lbs at this point." (*Id.*)

On May 7, 2013, Dr. Victor Isaac evaluated Plaintiff upon a referral "for conservative management" of her pain. (Doc. 9-10 at 79) Dr. Isaac noted Plaintiff complained of "neck pain and numbness in the right hand and feet," and she described her pain as "6/10, dull aching, [and] constant." (*Id.*) He found Plaintiff's coordination was intact and she had a normal range of motion in her cervical spine and neck. (*Id.*) Dr. Isaac determined Plaintiff exhibited trapezius tenderness and had a paraspinal muscle spasm. (*Id.* at 80) Dr. Isaac noted Plaintiff's medication included Gabapentin, Hydrocodone, Abilify, and Celexa; and recommended Plaintiff continue with a home exercise program. (*Id.* at 79-80)

Plaintiff had an MRI of her cervical spine done on May 10, 2013. (Doc. 9-10 at 43) Dr. John Ross noted "[o]nly sagittal T2 imaging was acquired, before [Plaintiff] terminated the procedure." (*Id.*) According to Dr. Ross, "[t]he included portions of the brain parenchyma and cervical cord signal appear[ed] normal" and there was a "[m]ild loss of lordosis." (*Id.*) He found "[n]o appreciable high-grade spinal/foraminal narrowing." (*Id.*) On May 20, she had another MRI of the cervical spine, as well as her lumbar spine. (*Id.* at 44-45) Dr. Andrew Brittan opined Plaintiff had a "reversal of [the] normal cervical lordosis which may be from muscular spasm" and "[a] tiny disc herniation … at the C7-T1 level." (*Id.* at 44) He found Plaintiff had fluid in the sphenoid sinus, which was "likely compatible with sinusitis." (*Id.*) Dr. Brittan opined there were "no abnormalities" at the C3-3, C3-4, C5-6, and C6-7 levels. (*Id.*) Dr. Brittan also determined Plaintiff had a "negative…examination of the lumbar spine without evidence of central or neural foraminal stenosis." (*Id.* at 45)

In June 2013, Plaintiff continued to report "neck pain with numbness in the right hand and feet." (Doc. 9-10 at 77) She also reported having joint stiffness and "[p]ainful joints." (*Id.*) Dr. Isaac opined Plaintiff had normal range of motion in her neck and shoulder joints; normal motor strength; and normal stability. (*Id.*) Dr. Isaac determined Plaintiff had a normal sensory exam. (*Id.*) He again found Plaintiff had a paraspinal muscle spasm. (*Id.*) On June 21, Plaintiff had an MRI of her thoracic spine, which Dr. Landman determined showed a "minimal bulge" at the T7-8 level and "[m]inimal disc space narrowing … at T8-9 and T9-10." (*Id.* at 47)

The following month, Plaintiff told Dr. Isaac that she did not feel her medication was helping but denied having any side effects. (Doc. 9-10 at 75) Dr. Isaac found Plaintiff continued to have a

normal range of motion in her neck and shoulder joint, normal sensations, and normal strength. (*Id.* at 73, 75) Plaintiff reported she had "some muscle spasm in her upper back," and Dr. Issac found she exhibited both paraspinal muscle spasm and trapezius tenderness. (*Id.*) Dr. Isaac discontinued the prescription for Robaxin and issued a new prescription for Norflex. (*Id.* at 76)

Plaintiff reported she continued to have upper back pain that she described as "6/10, dull aching, constant" in August 2013. (Doc. 9-10 at 71) Dr. Isaac recommended Plaintiff receive a trigger point injection for her upper back, and Plaintiff agreed to the treatment. (*Id.*) However, the injection was denied by her insurance. (*Id.* at 69)

In September 2013, Plaintiff had an "acute exacerbation" of her obstructive chronic bronchitis. (Doc. 9-11 at 20) She also reported "the muscle relaxer norflex [was] not working for her neck and shoulder spasm," though her pain was "reduced from 9/10 to 6/10 with [the] current dose of lortab." (Doc. 9-10 at 69) Dr. Isaac found Plaintiff's shoulder abduction range of motion was "slightly limited." (*Id.*) He determined Plaintiff had "no tenderness with palpation of joints, muscle spasm in neck and upper back." (*Id.*) Dr. Isaac opined Plaintiff had a normal gait, strength, and tone; but her "sensation [was] diminished in [her] left toes and left arm." (*Id.*) Dr. Isaac discontinued the prescriptions for Hydrocodone-Acetaminophen and Norflex, and prescribed Baclofen. (*Id.* at 70)

Dr. Elizabeth Shultz evaluated Plaintiff at the Vanderbilt Psychiatric Hospital on October 17, 2013, following Plaintiff's voluntary admission to the facility. (Doc. 9-10 at 35) During the physical examination, Dr. Shultz opined Plaintiff's muscle strength was "5/5 proximally" in her upper and lower extremities, "but 4+/5 distally." (*Id.* at 38) She also determined Plaintiff's "light touch sensation [was] intact grossly." (*Id.*)

In December 2013, Plaintiff told Daniel Rasbach, NP, that her back and neck pain had worsened. (Doc. 9-10 at 65) She believed she had "a pinched nerve in her heck and [said] that she [had] 'excruciating pain' in [her] right shoulder." (*Id.*) She also reported "having muscle spasms in [her] low back when standing to do dishes." (*Id.*) Plaintiff stated her depression was "much improved" with the new medication she received following her hospitalization. (*Id.*) Mr. Rasbach opined Plaintiff continued to have decreased sensation in her right arm and leg. (*Id.*) Plaintiff did not appear in acute distress and had "no tenderness with palpation of joints." (*Id.*) Dr. Isaac issued an order for Plaintiff to

5

receive physical therapy and directed her to notify his office of the progress, so cervical imaging could be ordered if there was no progress. (*Id.* at 66)

The following month, Plaintiff told Latonya King, APN, that she "no longer [had] a pinched nerve like she thought, and did not go to [physical therapy]." (Doc. 9-10 at 62) King clarified for Plaintiff that Dr. Isaac had instructed her to attend physical therapy and inform his office of the progress. (*Id.*) Despite reporting her pain was better, Plaintiff "asked if she could have more pain medication for breakthrough pain," and APN King noted Plaintiff "was inconsistent with history of pain level." (*Id.* at 63) Plaintiff's range of motion was normal for her cervical spine and neck, though she had mild tenderness in the paraspinal muscles. (*Id.*) She was informed physical therapy would help and she could "begin home exercises." (*Id.*)

In February 2014, Plaintiff again reported she "ha[d] not done physical therapy for her neck because her pinched nerve [had] resolved." (Doc. 9-10 at 59) However, Plaintiff continued to report "neck pain with numbness in the right hand and feet." (*Id.*) She said she was "taking medications as prescribed" and it "decrease[d] pain to 4-5/10." (*Id.*) Upon examination, Plaintiff had a normal gait, motor strength, active range of motion in the cervical spine, and range of motion in all directions in her neck. (*Id.* at 60) She exhibited mild tenderness in the paraspinal muscles, but "no tenderness with palpation of joints." (*Id.*) Dr. Isaac indicated Plaintiff was directed to continue home exercises and "[c]onsider more physical therapy," after Plaintiff reported she did not want physical therapy because prior sessions "made her fibromyalgia flare." (*Id.* at 59-60)

In March 2014, Plaintiff returned to the Isaac Spine Joint and Pain Institute, where she reported having "a lot of fibromyalgia flares" and she was in "constant agony [sic]." (Doc. 9-10 at 56-57) She stated that she had "a lot of drowsiness from her medication combinations" and weight gain of about 50 pounds in the past year, which she attributed to Gabapentin. (*Id.* at 57) Upon examination, Plaintiff did not exhibit any tenderness with palpation of joints, but she was "[u]nable to touch toes while sitting [due to] lack of flexibility and large abdomen." (*Id.*) She continued to have a normal gait and strength, with decreased sensation. (*Id.*) Plaintiff was "strongly encouraged to be more active and stretch" and "continue [a] home exercise program." (*Id.* at 58) Dr. Isaac terminated the prescription for Gabapentin and started Plaintiff on Lyrica "in hopes to decrease flares of fibromyalgia." (*Id.*) The following

month, Plaintiff reported that "the change… to lyrica [had] not helped much," though her swelling stopped. (*Id.* at 53)

Plaintiff slipped and fell, injuring her lower back, after which she requested an "increase in medication" in May 2014. (Doc. 9-10 at 50) On May 5, Plaintiff reported her pain was "8/10," and provoked by all activity. (*Id.*) She had a "full" range of motion, "with mild pain at extreme range of motion," and a positive straight leg raise test on the right. (*Id.*) Dr. Isaac added meloxicam to Plaintiff's medication and provided a Flector Patch. (*Id.* at 51)

On June 2, 2014, Plaintiff reported "improvement," stating her pain was "4/10" and the "Flector Patch worked well." (Doc. 9-15 at 32) Because the Flector Patch was not covered by Plaintiff's insurance, she was prescribed Voltaren Gel. (*Id.* at 32-33) Plaintiff again had a positive straight leg raise test on the right side," and "mild pain at extreme range of motion." (*Id.* at 32) On June 30, she continued to describe her pain as "4/10." (*Id.* at 28) Plaintiff had a full range of motion, with tenderness of the vertebral spine, paraspinal muscles and right-sided sacroiliac joint. (*Id.*) Plaintiff reported she would like to receive lumbar spinal injections, and Dr. Isaac indicated he would order an MRI of her lumbar spine. (*Id.* at 29)

Dr. Darrel Rinehart completed a physical consultative examination on July 1, 2014. (Doc. 9-11 at 3) Plaintiff reported she had "a history of neuropathy," low back pain, neck pain, fibromyalgia, and COPD. (*Id.*) She told Dr. Rinehart she was unable to work due to being "on oxygen 24x7" and the "neuropathy in her legs, which [made] her unstable." (*Id.* at 4) Plaintiff said she could "sit and stand up to 30 minutes," but if she did so for any longer her legs would go to sleep, and could "[]not lift much more than 10 lbs." (*Id.* at 3) Dr. Rinehart determined Plaintiff had a normal range of motion in her hands, wrists, elbows, shoulders, feet, ankles, knees, and hips; and her range of motion was limited in the cervical spine. (*Id.* at 5) Dr. Rinehart noted Plaintiff walked "slowly with normal station and gait" and "was able to get up on her heels and toes." (*Id.*) He found Plaintiff had "diminished sensation below the knees bilaterally going down into the feet and ankles" and "absent ankle jerk as well as knee jerk reflexes." (*Id.* at 6) According to Dr. Rinehart, Plaintiff's muscle strength "was approximately 4/5 in all muscle groups." (*Id.*) Dr. Rinehart ordered imaging of Plaintiff's lumbar spine and found "[m]ild lumbar spondylosis and degenerative disc disease at L2/3 and L3/4." (*Id.* at 7) Dr. Rinehart concluded:

"It is my opinion based on [the] exam and observation at this time that she cannot do any type of sitting, standing, lifting, or walking for any time in an eight-hour workday." (*Id.* at 6)

On July 24, 2014, Plaintiff requested a voluntary discharge from Isaac Spine Joint and Pain Institute, reporting "she moved too far away." (Doc. 9-15 at 30) Dr. Isaac referred Plaintiff to Comprehensive Pain Specialists, where Plaintiff had an initial appointment on August 12, 2014. (Doc. 9-16 at 3)

In August 2014, Sarah Trent, ANP, noted that Plaintiff presented with "diffuse pain," including "neuropathy in her feet and arms as well as neck pain and back pain." (Doc. 9-16 at 3) Ms. Trent found Plaintiff exhibited nine positive tender points for fibromyalgia. (*Id.* at 5) She observed that Plaintiff had "essentially" full range of motion and "diffuse tenderness with spasms" in the cervical spine, and "diffuse tenderness throughout [the] lumbar region." (*Id.* at 5-6) Plaintiff had "diminished sensation to light palpation" in the right arm, but full range of motion and full strength at 5/5. (*Id.* at 5) Likewise, Ms. Trent determined Plaintiff had a diminished sensation in her right leg, but full muscle strength. (*Id.* at 6) Dr. Richard Muench informed Plaintiff she would be required to attend physical therapy to receive opioid medication, and he referred her to a physical therapist for six weeks of treatment. (*Id.* at 7) In addition, Plaintiff was directed to "exercise and stop smoking." (*Id.*)

The following month, Plaintiff stated she believed Fentanyl was not working. (Doc. 9-15 at 77) Plaintiff was informed "her medication should not be used to relieve her all over body pain but should instead be used to help her to increase her activity level in order to become more active, lose weight, and decrease her pain by those means." (*Id.*) Plaintiff had a normal gait and "no focal signs" with the neurological exam. (*Id.* at 80)

On October 6, 2014, Plaintiff reported she had not started physical therapy and reported she was "out of PT referrals," which Ms. Trent noted had not been confirmed with the insurance company. (Doc. 9-15 at 71) Plaintiff said she was walking three days per week and progressed to "'a full loop' at the park instead of the half loop she was previously doing," which took her 20-30 minutes. (*Id.*) The same date, Plaintiff requested a voluntary discharge from Comprehensive Pain Specialists in anticipation of a move to California. (*Id.*; *see also* Doc. 9-16 at 14)

Dr. Carolyn Parrish completed a physical residual functional a capacity regarding Plaintiff's

current level of functioning on October 7, 2014. (Doc. 9-5 at 43-47) Dr. Parrish opined there was no medically-determinable impairment "documented that would reasonably result in [her] inability to sit, stand, lift, [and] walk for any length of time in an 8 [hour] day," and the limitations identified by Dr. Rinehart were inconsistent with the "longitudinal exams." (*Id.* at 46) Dr. Parrish opined Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk about six hours in an eight-hour day; sit about six hours in an eight-hour day. (*Id.* at 43-44) She determined Plaintiff could frequently climb ramps and stairs, balance, and stoop; and occasionally kneel, crouch, crawl, and climb ladders and ropes. (*Id.* at 44) Dr. Parrish found Plaintiff was limited with reaching overhead with either arm, and she was limited to frequent handling and fingering with the right hand. (*Id.* at 44-45) Dr. Parrish opined Plaintiff should "[a]void concentrated exposure" to extreme cold, vibrations, fumes, odors, dusts, gases, and poor ventilation. (*Id.* at 45)

Dr. J. Mitchell reviewed the record related to Plaintiff's request for reconsideration and completed a current physical residual functional capacity assessment on April 27, 2015. (*See* Doc. 9-5 at 65, 70-71) Dr. Mitchell noted Plaintiff's medical records included "normal" physical examinations, "except for obesity [and] tender points." (*Id.* at 65) In addition, Dr. Mitchell noted Plaintiff had a normal gait, negative straight leg raise tests, and 5/5 motor strength; though she also had tenderness to palpation and mild degenerative changes. (*Id.*) Dr. Mitchell concluded Plaintiff able to perform light work with a limitation to frequent postural activities, with Plaintiff's "pain [and] fatigue considered." (*Id.*) In addition, Dr. Mitchell concluded Plaintiff did not have manipulative or environmental limitations. (*Id.* at 71)

There are no treatment notes records related to Plaintiff's physical impairments from November 2014 through January 2016, aside from the denial of a cervical spine MRI request and treatment for a strep infection. (*See* Doc. 9-15 at 14-21; Doc. 9-16 at 15; *see also* Doc. 9-3 at 23)

Sharon Powell, NP-C, evaluated Plaintiff at Pine Mountain Health Center on January 28, 2016. (Doc. 9-16 at 15) Plaintiff stated she had "pain radiating to [her] legs," which she described as "moderate (5-7)". (*Id.* at 19) She reported she had been "really tired" and that she used a C-PAP machine when in Kentucky but returned it when she moved to California. (*Id.*) Plaintiff requested a medication refill and indicated she wanted "a new TENS unit." (*Id.*) Ms. Powell observed that

9

Plaintiff appeared in moderate distress and had "limited ambulation." (*Id.*) Plaintiff had a full range of motion in her neck and "normal movement of all extremities." (*Id.* at 19-20) In addition, Ms. Powell opined Plaintiff had normal motor strength, no tenderness, and her sensory functions were "grossly intact." (*Id.*)

Plaintiff had an MRI on her lumbar spine on December 29, 2016. (Doc. 9-16 at 31) Dr. Port determined Plaintiff had "[m]oderate degenerative disc disease" at the L2-L3 level. (*Id.*)

Ms. Powell completed a medical source statement concerning Plaintiff's physical impairments on March 7, 2017. (Doc. 9-16 at 21) Ms. Powell indicated she first treated Plaintiff in October 2015 and saw her on a "monthly as needed" basis. (*Id.*) She noted Plaintiff was diagnosed with chronic moderate/severe back pain, fibromyalgia, and peripheral neuralgia secondary to diabetes; and her prognosis was fair. (*Id.*) She indicated with a scale of 0-10, Plaintiff's pain was "7-8" and her fatigue was a "6." (*Id.*) Ms. Powell opined that in an eight-hour day, Plaintiff could sit for four hours, stand and walk 0-2 hours, and would need to "not sit continuously." (*Id.* at 22) Ms. Powell indicated Plaintiff could never lift and carry less than ten pounds and had "significant limitations in doing repetitive reaching, handling, fingering, or lifting." (*Id.*) Further, she believed Plaintiff's "condition interfer[red] with the ability to keep [her] neck in a constant position." (*Id.*) Ms. Powell determined Plaintiff could frequently crawl; occasionally climb, stoop, and crouch; and never balance or kneel. (*Id.* at 23) According to Ms. Powell, Plaintiff was "[c]apable of low stress jobs." (*Id.*) She indicated the basis for her conclusions regarding Plaintiff's limitations was the "pain experienced by [Plaintiff] is very fatiguing [and] causes depression." (*Id.* at 24) Ms. Powell concluded Plaintiff was likely to miss work more than three times per month. (*Id.*) When asked the "earliest date" that her answers to the questionnaire applied, Ms. Powell noted it was a "current" evaluation. (*Id.*)

**B.    The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff not engaged in substantial gainful activity since the application date of February 27, 2014. (Doc. 9-3 at 19) Second, the ALJ found Plaintiff's severe impairments included: chronic pain, diabetes, post-traumatic stress disorder (PTSD), depression, degenerative disc disease, fibromyalgia, asthma, chronic obstructive pulmonary disease (COPD), sleep apnea, and obesity. (*Id.* at 19-20) At step three, the ALJ determined this

impairment did not meet or medically equal a Listing. (*Id.* at 20-21) Next, the ALJ found:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequent postural activities including climbing, balancing, kneeling, crouching, crawling, and balancing; simple routine work; nonpublic; and no more than occasional contact with coworkers and supervisors.

(*Id.* at 21) With this residual functional capacity, the ALJ determined at step four that Plaintiff was "unable to perform any past relevant work." (*Id.* at 26) At step five, the ALJ determined there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.* at 27) Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.*)

## **DISCUSSION AND ANALYSIS**

Appealing the decision to deny her application for benefits, Plaintiff argues the ALJ erred in evaluating the medical opinions from Dr. Rinehart and Ms. Powell. (Doc. 13 at 7-13) According to Plaintiff, the ALJ "substitute[d] her own lay opinion for that of the medical professional[s]." (*Id.* at 10) The Commissioner argues that "[w]hile Plaintiff may have a different interpretation of the evidence," [s]ubstantial evidence supported the ALJ's decision." (Doc. 16 at 14)

### A. **Evaluation of the Medical Evidence**

When evaluating the evidence from medical professionals, three categories of physicians are distinguished: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight, but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. § 404.1527(d)(2). Finally, an ALJ must consider the opinions of other medical professionals— such as nurse practitioners, physician assistants, and social workers—who may offer "judgment about some of the same issues addressed in medical opinions from acceptable medical sources." 20 C.F.R. § 404.1527(f)(1); *see also Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (describing circumstances when opinions from "other sources" may be considered acceptable medical opinions).

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). An ALJ may reject the opinion of a medical sources that is contradicted by another opinion with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Here, the ALJ was required to identify specific and legitimate reasons supporting her decision to reject the conclusions of Dr. Rinehart and Ms. Powell, which conflicted with the opinions of Drs. Wilson, Parrish, and Mitchell.

Explaining the weight given to the physical limitations identified by Dr. Rinehart and FNP. Powell, the ALJ indicated:

> I also give consultative examiner Dr. Rinehart's opinion little weight. He found the claimant incapable of sitting, standing, lifting, or walking for any length of time in an 8-hour workday (Exhibit B7F). This opinion is given little weight because it is not supported by the medical evidence, including his own examination. He found full range of motion in the bilateral lower and upper extremities, and normal station and gait. She was also able to get up and down from the table and get up on her heels and toes. Moreover, the x-ray of the lumbar spine taken during the evaluation showed only mild abnormalities. Thus, this is inconsistent with his finding of extreme functional limitations.
>
> The claimant's treating provider, Sharon Powell, FNP, provided a medical source statement, finding the claimant capable of sitting for 4 hours, standing and walking 0-2 hours, and lifting and carrying no weight. She could also never balance or kneel, perform all other postural activities occasionally, and was likely to be absent more than 3 times per month. (Exhibit B15F). This opinion is given little weight, as the medical evidence does not support the extreme limitations Ms. Powell found. As previously stated, physical examinations showed mostly full range of motion in the upper and lower extremities, and normal gait. There is very little indication that she could not stand or walk more than 2 hours or lift no weight. Moreover, although Ms. Powell stated she has been treating the claimant from October 2015 through March 2017, she submitted only one treatment note from January 2016, where the claimant exhibited normal tone and motor strength, normal movement of all extremities, and normal gait and station (Exhibit 14F).

(Doc. 9-3 at 26) Plaintiff contends the ALJ's rejection of these opinions was not proper, and the ALJ "neither offered a legitimate conclusion [nor] a legally sufficient reason" as to why she rejected the opinions. (Doc. 13 at 9)

1. Inconsistencies with a record

The Ninth Circuit determined a medical opinion may be rejected where an ALJ finds incongruity between physician or treatment provider's assessment and his own medical records, and the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008). Similarly, inconsistency with the overall record constitutes a legitimate reason for discounting a medical opinion. *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999). To reject an opinion as inconsistent with the treatment notes or medical record, the "ALJ must do more than offer [her] conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Id.*, 849 F.2d at 421-22.

2. Evaluation of Dr. Rinehart's opinion

The ALJ noted that Dr. Rinehart "found the claimant incapable of sitting, standing, lifting, or walking for any length of time in an 8-hour day." (Doc. 9-3 at 26) However, the ALJ rejected this conclusion as unsupported by Dr. Rinehart's "own examination," because Dr. Rinehart found Plaintiff exhibited a "full range of motion in the bilateral lower and upper extremities, and normal station and gait" at the consultative examination. (*Id.*) The ALJ noted Plaintiff "was also able to get up and down from the table and get up on her heels and toes." (*Id.*) Finally, as the ALJ observed, "the x-ray of [Plaintiff's] lumbar spine taken during the evaluation showed only mild abnormalities." (*Id.*)

Because the ALJ carried the burden to identify specific inconsistencies between the findings of Dr. Rinehart on examination and the "extreme functional limitations" identified, the conflict is specific and legitimate reason for giving less weight to the opinion of Dr. Butuin. *See Thommasetti,* 553 F.3d at 1041; *see also Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (physician's opinion properly rejected where the treatment notes and findings "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"). Moreover, the ALJ's resolution of the conflicting medical evidence must be upheld by the Court, even where there is "more than one rational interpretation of the evidence." *Allen,* 749 F.2d at 579*; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the

evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

### 3. Evaluation of Ms. Powell's opinion

The ALJ observed Ms. Powell opined Plaintiff was "capable of sitting for 4 hours, standing and walking 0-2 hours, and lifting and carrying no weight. She could also never balance or kneel, perform all other postural activities occasionally." (Doc. 9-3 at 25) The ALJ opined these were "extreme limitations" that were unsupported by the medical evidence and the treatment records from Ms. Powell, and the ALJ gave the opinion "little weight." (*Id.* at 25-26)

In doing so, the ALJ again noted that Plaintiff's "physical examinations showed mostly full range of motion in the upper and lower extremities, and normal gait." (Doc. 9-3 at 25) The ALJ also found "very little indication that [Plaintiff] could not stand or walk more than 2 hours or lift no weight." (*Id.*) Further, the ALJ observed that in the only treatment records provided from Ms. Powell, from January 2016, Plaintiff "exhibited normal tone and motor strength, normal movement of all extremities, and normal gait and station." (Doc. 9-3 at 26, citing Exh. 14F [Doc. 9-16 at 15-20]) Thus, the ALJ met her burden to identify specific objective findings in the record that were inconsistent with the limitations identified by Ms. Powell and demonstrated specific and legitimate reasons to reject the limitations. *See Thommasetti,* 553 F.3d at 1041; *see also Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (an opinion may be rejected "if brief and conclusory in form with little in the way of clinical findings to support [its] conclusion).

### B. Substantial evidence supports the ALJ's determination

When an ALJ rejects a medical opinion, the ALJ must not only identify a specific and legitimate reason for rejecting the opinion, but the decision must also be "supported by substantial evidence in the record." *Lester*, 81 F.3d at 830. Accordingly, because the ALJ articulated specific and legitimate reasons for rejecting the opinions of Dr. Rinehart and Ms. Powell, the decision must be supported by substantial evidence in the record. Plaintiff contends the ALJ failed to meet this burden, and instead substituted her own opinion for those of a physician, without the support of substantial evidence. (Doc. 13 at 8-9)

The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the

evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8[3]. "It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.*

The ALJ gave weight to the opinions from Drs. Wilson and Mitchell in determining Plaintiff's residual functional capacity assessment. (Doc. 9-3 at 24-25) Although Plaintiff contends the ALJ erred in relying on the opinion because it was from 2012 and Dr. Rinehart examined Plaintiff in July 2014 (Doc. 13 at 12), Plaintiff alleged that her disability began in September 2010 and thus the opinion is relevant to Plaintiff's claimed disability. (*See* Doc. 9-5 at 31; Doc. 9-3 at 17) Moreover, an "ALJ is entitled to choose between differing medical opinions of equal weight. Indeed, that is the ALJ's function." *Williams v. Astrue*, 2010 WL 3515744, at *6 (N.D. Cal. Sept. 8, 2010) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1042-43 (9th Cir. 1995)).

As noted by the ALJ, Dr. Wilson examined Plaintiff and found she was "capable of sitting for 6-8 hours [and] standing and walking 4-6 hours." (*Id.* at 25) In addition, the ALJ that Dr. Wilson opined Plaintiff was limited to "lifting only 10 pounds" for a limited time "based on the claimant's recent hysterectomy at the time of the examination," and the following treatment record did not indicate "any further issues after the hysterectomy."[4] (*Id.*) The opinions of Dr. Wilson constitute substantial evidence in support of the ALJ's conclusion that Plaintiff could perform work at the light level of exertion, because they "rest[] on independent examination." *Tonapetyan*, 242 F.3d at 1149; *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (when an examining physician provides independent clinical findings, such findings are substantial evidence).

Further Dr. Mitchell reviewed the record related to Plaintiff's request for reconsideration and noted Plaintiff's medical records included "normal" physical examinations, "except for obesity [and]

---

[3] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations").

[4] Thus, the ALJ adopted the findings of Dr. Wilson related to Plaintiff's ability to sit, stand, and walk; but rejected the limitation related to her ability to lift and carry due to its temporal status. (*Id.*)

tender points." (Doc. 9-5 at 65) In addition, Dr. Mitchell noted Plaintiff had a normal gait, negative straight leg raise tests, and 5/5 motor strength; though she also had tenderness to palpation and mild degenerative changes. (*Id.*) Dr. Mitchell concluded Plaintiff was capable of performing light work with a limitation to frequent postural activities, with Plaintiff's "pain [and] fatigue considered." (*Id.*) These findings are consistent with the limitations imposed by Dr. Wilson. As a result, the opinions of Dr. Mitchell are also substantial evidence in support of the ALJ's decision. *See Tonapetyan*, 242 F.3d 1149 (the opinions of non-examining physicians "may constitute substantial evidence when ... consistent with other independent evidence in the record").

## **CONCLUSION AND ORDER**

For the reasons set for above, the Court finds the ALJ set forth specific and legitimate reasons to reject the limitations identified by Dr. Rinehart and Ms. Powell and the decision is supported by substantial evidence in the record. Thus, the Court must uphold the conclusion that Plaintiff was not disabled as defined by the Social Security Act. *Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant, Andrew M. Saul, Commissioner of Social Security, and against Plaintiff Patricia J. Massey.

IT IS SO ORDERED.

Dated: __**September 17, 2019**__       ____/s/ Jennifer L. Thurston__
                                                   UNITED STATES MAGISTRATE JUDGE